**137 Nev., Advance Opinion 46**

IN THE SUPREME COURT OF THE STATE OF NEVADA

|  |  |
|---|---|
| ROBERT CLARKE, AN INDIVIDUAL, Appellant, vs. SERVICE EMPLOYEES INTERNATIONAL UNION, AN UNINCORPORATED ASSOCIATION; AND NEVADA SERVICE EMPLOYEES UNION, A/K/A CLARK COUNTY PUBLIC EMPLOYEES ASSOCIATION, SEIU 1107, A NONPROFIT COOPERATIVE CORPORATION, Respondents. | No. 80520 <br><br> FILED <br> SEP 16 2021 <br> ELIZABETH A. BROWN <br> CLERK OF SUPREME COURT <br> BY _____ <br> CHIEF DEPUTY CLERK |
| SERVICE EMPLOYEES INTERNATIONAL UNION, AN UNINCORPORATED ASSOCIATION; AND NEVADA SERVICE EMPLOYEES UNION, A/K/A CLARK COUNTY PUBLIC EMPLOYEES ASSOCIATION, SEIU 1107, A NONPROFIT COOPERATIVE CORPORATION, Appellants, vs. DANA GENTRY, AN INDIVIDUAL; AND ROBERT CLARKE, AN INDIVIDUAL, Respondents. | No. 81166 |

Consolidated appeals from district court orders granting summary judgment and denying post-judgment motions for attorney fees in an employment matter. Eighth Judicial District Court, Clark County; Gloria Sturman, Judge.

21-26880

*Affirmed in part, reversed in part, and remanded (Docket No. 80520); affirmed in part, vacated in part, and remanded (Docket No. 81166).*

McAvoyAmaya & Revero and Michael J. McAvoyAmaya, Las Vegas,
for Appellant/Respondent Robert Clarke and Respondent Dana Gentry.

Christensen James & Martin and Evan L. James, Las Vegas,
for Respondent/Appellant Nevada Service Employees Union.

Rothner, Segall & Greenstone and Jonathan M. Cohen, Maria Keegan Myers, and Glenn Rothner, Pasadena, California,
for Respondent/Appellant Service Employees International Union.

---

BEFORE THE SUPREME COURT, EN BANC.

*OPINION*

By the Court, CADISH, J.:

These consolidated appeals arise from the termination of appellant's employment with the Nevada Service Employees Union. The main issue in the appeal in Docket No. 80520 concerns whether appellant's wrongful termination claims against the union respondents were conflict-preempted by the Labor Management Reporting and Disclosure Act (LMRDA), which promotes union democracy. Applying principles of conflict preemption, we hold that because Nevada's wrongful termination claims do not significantly conflict with any concrete federal interest expressed by the LMRDA, the LMRDA does not preempt these claims. Additionally, because appellant failed to show that a genuine dispute of material fact existed regarding his alter ego theory of liability, the district court did not err when it granted summary judgment in favor of one of the union respondents on

that ground. As to the attorney fees issue in Docket No. 81166, we conclude that the district court acted within its discretion when it denied a union respondent's motion for attorney fees because rejection of the unions' unclear offers of judgment was not grossly unreasonable.

## FACTS

Nevada Service Employees Union, Local 1107 is the Nevada chapter of Service Employees International Union (SEIU) (collectively the Unions). In August 2016, Local 1107 hired Robert Clarke as Director of Finance and Human Resources for the union, pursuant to an employment contract. In this senior level position, Clarke was responsible directly to the Local 1107 president, Cherie Mancini. The employment contract contained a for-cause termination provision stating that "[t]ermination of this employment agreement may be initiated by the [Local 1107] President for cause." A similar for-cause termination provision was contained in Local 1107's employment contract with Dana Gentry for her position as Communications Director. In performing their managerial duties with Local 1107, both Clarke and Gentry attended weekly meetings with Mancini and another employee, Peter Nguyen. Clarke, Gentry, and Nguyen collectively constituted Local 1107's "managers" or "directors."

In fall 2016, SEIU appointed a hearing master to hear grievances against Mancini and to make recommendations regarding the internal needs of Local 1107. In her April 2017 reports, the hearing master concluded that "[t]he overall pattern that emerges from the evidence is one of a President willing, and even inclined, to sideline her fellow officers so that she can function autocratically or, at best, with a small cadre of staff whose hiring was never even approved by the [Local 1107 Executive] Board." Because of the hearing master's reports, Local 1107's Executive Board voted to have SEIU impose a trusteeship over the chapter. The

SUPREME COURT
OF
NEVADA

(O) 1947A

3

trustees, who acted on behalf of Local 1107 once appointed by SEIU, subsequently removed all board members from office, including Mancini, and terminated Clarke's and Gentry's employment.[1]

Clarke and Gentry filed the underlying complaint against the Unions, as well as against other defendants who are not named parties on appeal, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, intentional interference with contractual relations, wrongful termination, tortious discharge, and negligence (collectively the wrongful termination claims). The Unions served an NRCP 68 offer of judgment on Clarke and Gentry of $30,000 each, on behalf of all defendants, to dismiss all claims. Clarke and Gentry did not accept the offer of judgment. The Unions later moved for summary judgment, arguing that the LMRDA preempted Clarke's and Gentry's claims. SEIU also sought summary judgment on the basis that it owed Clarke and Gentry no duty because it had not employed them or entered into any employment contract with either of them. In Clarke and Gentry's opposition to those motions, they asserted for the first time that SEIU was the alter ego of Local 1107. The district court ultimately granted the Unions' motions, concluding that the LMRDA preempted all of Clarke's and Gentry's claims. The court further concluded that SEIU was entitled to summary judgment because it had not employed or entered into a contract with Clarke or Gentry.

The Unions then moved for attorney fees based on their rejected offer of judgment, which the district court denied. While the court found that the offer of judgment complied with NRCP 68 and was reasonable in

_____

[1]The Ninth Circuit Court of Appeals later upheld the trusteeship. *Garcia v. Serv. Emps. Int'l Union*, Nos. 19-16863, 19-16933 & 19-16934, 2021 WL 1255615, at *2 (9th Cir. Apr. 5, 2021).

amount and timing, it also found that "it was not grossly unreasonable for [Clarke and Gentry] to reject the Offer of Judgment because the Offer of Judgment required a global resolution of all claims against all Defendants." Clarke, but not Gentry, appeals from the order granting summary judgment, and the Unions appeal from the order denying their motion for attorney fees.

## DISCUSSION

### *The LMRDA does not preempt state law wrongful termination claims*

We review questions of federal preemption and decisions granting summary judgment de novo. *Nanopierce Techs., Inc. v. Depository Tr. & Clearing Corp.*, 123 Nev. 362, 370, 168 P.3d 73, 79 (2007) (explaining that we review questions of federal preemption de novo); *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005) (explaining that we review decisions regarding summary judgment de novo). The Unions, relying on *Finnegan v. Leu*, 456 U.S. 431 (1982), and *Screen Extras Guild, Inc. v. Superior Court*, 800 P.2d 873 (Cal. 1990), argue that Nevada law wrongful termination claims conflict with the LMRDA's policy of ensuring democratic governance of labor unions, and thus the LMRDA preempts those wrongful termination claims, such that the district court properly granted summary judgment in their favor. We disagree.

"[W]hen a conflict exists between federal and state law, valid federal law overrides, *i.e.*, preempts, an otherwise valid state law." *Nanopierce Techs.*, 123 Nev. at 370, 168 P.3d at 79. In preemption analysis, courts must determine whether Congress expressly or impliedly intended to preempt state law. *Id.* Although there are different types of preemption, the only potentially applicable type of preemption in this matter—and the only type argued by the Unions—is conflict preemption. In analyzing whether conflict preemption applies, a court "examines the federal statute

as a whole to determine whether a party's compliance with both federal and state requirements is impossible or whether, in light of the federal statute's purpose and intended effects, state law poses an obstacle to the accomplishment of Congress's objectives." *Id.* at 371-72, 168 P.3d at 80. In other words, we ask "whether the act's purpose would be frustrated if state law were to apply." *Id.* at 375, 168 P.3d at 82. A general tension with the broad or abstract goals of federal laws or programs is insufficient to warrant conflict preemption. *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 633-34 (1981). Instead, courts should not displace state law unless there is a "significant conflict" between the operation of the state law and concretely identifiable federal interests. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988). As "[s]tates possess broad authority under their police powers to regulate the employment relationship to protect workers within the [s]tate," *MGM Grand Hotel-Reno, Inc. v. Insley*, 102 Nev. 513, 518, 728 P.2d 821, 824 (1986) (quoting *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)), there must be a "clear and manifest" indication of Congress's intent to preempt state law, *Nanopierce Techs.*, 123 Nev. at 370-71, 168 P.3d at 79 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)) (explaining that "Congress's intent to preempt state law, in light of a strong presumption that areas historically regulated by the states generally are not superseded by a subsequent federal law, must be 'clear and manifest'").

Clarke's wrongful termination claims—both in contract and in tort—are all based on his allegedly wrongful discharge from employment. Thus, for his claims to be viable, we must first determine whether the LMRDA, which has the goal of promoting union democracy, preempts Nevada law wrongful termination claims. We conclude it does not.

SUPREME COURT
OF
NEVADA

(O) 1947A

In *Finnegan*, on which the Unions rely, a newly elected union president fired several union business agents who, in their capacity as union members, supported a different candidate for union president. 456 U.S. at 433-34. Relying on the LMRDA, which protects union members' political rights, the business agents filed suit in federal district court, arguing that their firings were a form of "discipline" based on their exercise of guaranteed political rights and thus prohibited under the LMRDA. *Id.* at 437. The United States Supreme Court disagreed, holding that the LMRDA's prohibition against discipline "refers only to retaliatory actions that affect a union member's rights or status *as a member* of the union." *Id.* (emphasis in original). Because discharge from union employment does not affect union member rights, the LMRDA did not prohibit the termination. *Id.* at 438.

Further, the Supreme Court held that the LMRDA "does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own." *Id.* at 441. While acknowledging that "the ability of an elected union president to select his own administrators" is an important part of union governance and is not "inconsistent" with the LMRDA's goals, the Supreme Court recognized that "neither the language nor the legislative history of the [LMRDA] suggests that it was intended even to address the issue of union patronage." *Id. Finnegan*, thus, did not address a situation where, as here, a union employee has a for-cause employment contract and asserts state law wrongful termination claims.[2]

---

[2]Indeed, the Supreme Court has previously recognized that the LMRDA generally does not preempt state causes of action and expressly states when it intends to preempt state law. *See De Veau v. Braisted*, 363 U.S. 144, 156 (1960) (acknowledging that "[t]he [LMRDA], which reflects

SUPREME COURT
OF
NEVADA

(O) 1947A

7

*See id.* at 442 (recognizing that "[n]othing in the [LMRDA] evinces a congressional intent to alter the traditional pattern which would permit a union president *under these circumstances* to appoint agents of his choice to carry out his policies" (emphasis added)). Nor did the *Finnegan* decision hold or even imply that pursuing such claims would frustrate any federal purpose or that complete and unfettered union patronage was a concretely identifiable federal interest; to the contrary, the Supreme Court observed that Congress was not even concerned with union patronage practices when drafting the LMRDA. *See id.* at 441.

The other case on which the Unions rely, *Screen Extras Guild,* does not require a different conclusion even though it does address preemption. In *Screen Extras Guild,* a union business agent filed a wrongful termination suit. 800 P.2d at 875. Applying a novel "substantive or jurisdictional" preemption analysis, the California Supreme Court concluded that there was an actual conflict between California's wrongful termination cause of action and the LMRDA's underlying policies. *Id.* at 875-77. The court in *Screen Extras Guild* acknowledged that the LMRDA's primary objective is to ensure union democracy, as articulated in *Finnegan.* *Id.* at 877. But from there, it reasoned that *Finnegan* determined that "Congress must have intended that elected union officials would retain unrestricted freedom to select business agents, *or, conversely, to discharge business agents with whom they felt unable to work or who were not in accord with their policies,*" and thus the court concluded that "even 'garden-variety'

_____

congressional awareness of the problems of pre-emption in the area of labor legislation, . . . did not leave the solution of questions of pre-emption to inference. When Congress meant pre-emption to flow from the [LMRDA] it expressly so provided.").

SUPREME COURT
OF
NEVADA

(O) 1947A

wrongful termination actions . . . implicate the union democracy concerns of the LMRDA." *Id.* at 877, 879 (emphasis added). We disagree.

As discussed above, *Finnegan* does not stand for such a broad application of the LMRDA. *Finnegan* did not hold that union officials may, despite a for-cause employment agreement, "discharge business agents with whom they felt unable to work or who were not in accord with their policies." *Id.* at 877. Its holding that termination of the employee in that case was *not inconsistent* with the LMRDA's goals does not support a logical leap to the conclusion that the LMRDA *requires* unfettered union employee termination in violation of generally applicable state law. Further, *Screen Extras Guild* never attempted to reconcile the *Finnegan* Court's acknowledgment that the LMRDA was not "intended even to address the issue of union patronage," 456 U.S. at 441, with Supreme Court precedent on preemption, which requires that Congress have a clear and manifest intent to preempt state law in areas traditionally left to the state's police power, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). How can Congress show a clear and manifest intent to preempt state wrongful termination claims by discharged union employees when it was not concerned with union patronage at all? Simply, it cannot, and it did not do so here. Thus, because there is no "clear and manifest" indication of Congress's intent to preempt wrongful termination claims, *Nanopierce Techs.*, 123 Nev. at 370-71, 168 P.3d at 79, nor a "significant conflict" between the operation of state law and a concrete federal interest, *Boyle*, 487 U.S. at 507, we reject the California approach and hold that the LMRDA

SUPREME COURT
OF
NEVADA

(O) 1947A

9

does not preempt Nevada wrongful termination claims.[3] Accordingly, the district court erred in entering summary judgment in favor of the Unions on conflict-preemption grounds.[4]

*Clarke failed to show that a genuine dispute of material fact existed to preclude summary judgment in favor of SEIU*

The Unions argue that Clarke failed to show sufficient evidence to support his purported alter ego claim against SEIU. Assuming without deciding that Clarke sufficiently pleaded his alter ego claim, we agree that he failed to show sufficient evidence to survive summary judgment.

To demonstrate alter ego status, one must show "that the subsidiary corporation is so organized and controlled, and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation." *Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2*, 95 Nev. 463, 466, 596 P.2d 227, 229 (1979) (internal quotations omitted). Alter ego liability is established when a preponderance of the evidence shows:

> (1) The corporation must be influenced and governed by the person asserted to be its alter ego; (2) There must be such unity of interest and ownership that one is inseparable from the other; and (3) The facts must be such that adherence to the fiction of separate entity would, under the

---

[3]This conclusion is consistent with the LMRDA's express non-preemption provision. *See* 29 U.S.C. § 523(a) (2019) ("Except as explicitly provided to the contrary, nothing in this chapter shall reduce or limit the responsibilities of any labor organization . . . under any other Federal law or under the laws of any State . . . .").

[4]The dissent misinterprets our holding. We do not require the trustee, or an elected union president, to continue a union employee's employment. Instead, we merely hold that, if a trustee or union employer terminates a union employee who has a for-cause employment contract, that employee's wrongful termination action is not preempted by the LMRDA. We express no opinion on the merits of the claims asserted by Clarke or Gentry.

circumstances, sanction a fraud or promote injustice.

*Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 124 Nev. 629, 635, 189 P.3d 656, 660 (2008) (internal quotation omitted).

Here, the record does not show that there was a unity of interest or ownership between SEIU and Local 1107. Generally, the commingling of funds, shared operations, shared headquarters, shared bank accounts, or failure to observe corporate formalities shows unity of interest or ownership. *Truck Ins. Exch.*, 124 Nev. at 635-36, 189 P.3d at 660-61; *Bonanza*, 95 Nev. at 467, 596 P.2d at 230. Local 1107 maintained its own accounts and was financed by its members, not SEIU. The trustees utilized Local 1107's headquarters and finances during the trusteeship. There is no evidence SEIU and the trustees or Local 1107 were inseparable from one another. Further, the Ninth Circuit upheld the imposition of the trusteeship. Thus, the trusteeship was not the progeny of fraud or injustice. Moreover, there is no evidence that SEIU imposed the trusteeship over Local 1107 for unlawful or unjust purposes, or that Clarke was under the mistaken impression that SEIU was actually his employer or would be responsible to him under his employment contract. Accordingly, we conclude that there were no genuine issues of material fact regarding the second or third elements of alter ego liability. *Wood*, 121 Nev. at 729, 121 P.3d at 1029. Thus, the district court did not err when it granted summary judgment in SEIU's favor. *See Hannam v. Brown*, 114 Nev. 350, 357, 956 P.2d 794, 799 (1998) ("[T]his court will affirm the order of the district court if it reached the correct result, albeit for different reasons." (internal quotation omitted)).

Supreme Court
of
Nevada

(O) 1947A

11

*The district court did not abuse its discretion in denying SEIU's motion for attorney fees*

Because the district court properly granted summary judgment on the claims against SEIU, we must consider whether the district court abused its discretion in denying SEIU's motion for attorney fees.[5] NRCP 68(c) permits multiple offerors to make an offer of judgment to multiple offerees. Under NRCP 68(f), an offeror may recover its reasonable post-offer attorney fees if the offeree rejected its offer of judgment and did not obtain a more favorable judgment. Before awarding attorney fees under this rule, the district court must consider the four *Beattie* factors:

> (1) whether the plaintiff's claim was brought in good faith; (2) whether the defendant['s] offer of judgment was reasonable and in good faith in both its timing and amount; (3) whether the plaintiff's decision to reject the offer and proceed to trial was grossly unreasonable or in bad faith; and (4) whether the fees sought by the offeror are reasonable and justified in amount.

*Beattie v. Thomas*, 99 Nev. 579, 588-89, 668 P.2d 268, 274 (1983). "[N]o one factor under *Beattie* is determinative and [the district court] has broad discretion to grant the request so long as all appropriate factors are considered." *Yamaha Motor Co., U.S.A. v. Arnoult*, 114 Nev. 233, 252 n.16, 955 P.2d 661, 673 n.16 (1998).

The district court found that it was "not grossly unreasonable" for Clarke and Gentry to reject the offer of judgment because the offer required a global resolution of all claims and it was unclear to the court

---

[5]Because we reverse the summary judgment in Local 1107's favor and remand for further proceedings, we necessarily vacate the district court's order denying Local 1107's motion for attorney fees based on a rejected offer of judgment. *See* NRCP 68(f).

"how the [p]laintiffs could have properly analyzed the Offer of Judgment." In regard to lack of clarity, the record supports the district court's findings that (1) it would be impossible for either Clarke or Gentry to settle only with one of the defendants, if they felt inclined to do so, because the offer required both plaintiffs to settle with all defendants; (2) the offer required dismissal of all claims against all defendants even though one of the defendants was unrepresented by counsel and unaware of the offer; and (3) the offer did not state who would pay Clarke and Gentry if the offer were accepted. As the record supports the district court's conclusion that it was not grossly unreasonable for Clarke and Gentry to reject the offer on the basis that it lacked clarity, we perceive no abuse of discretion in its decision denying SEIU's motion for attorney fees. *Gunderson v. D.R. Horton, Inc.*, 130 Nev. 67, 80, 319 P.3d 606, 615 (2014) (reviewing a district court's decision denying attorney fees for an abuse of discretion).

## CONCLUSION

The LMRDA does not preempt Nevada wrongful termination claims, because permitting such claims would not frustrate the purpose of the LMRDA. Thus, the district court erred in granting summary judgment on Clarke's claims based on preemption. As Clarke failed to show that a genuine dispute of material fact existed regarding his alter ego theory of liability, the district court properly entered summary judgment in favor of SEIU because SEIU did not otherwise employ Clarke. Finally, the record supports the district court's finding that it was not grossly unreasonable for Clarke and Gentry to reject SEIU's offer of judgment, and thus, the court did not abuse its discretion by denying SEIU's motion for attorney fees. Accordingly, we reverse the district court's order in Docket No. 80520 to the extent that it granted summary judgment on the basis that the LMRDA preempted Clarke's wrongful termination claims and remand for further

proceedings as to those claims. However, we affirm the portion of the district court's order in Docket No. 80520 granting summary judgment in favor of SEIU because even assuming the claim was properly pleaded, Clarke nevertheless failed to show a genuine dispute of material fact as to his alter ego theory of liability and SEIU did not employ or have an employment contract with Clarke. Finally, we affirm the district court's order denying SEIU's motion for attorney fees and vacate and remand the order denying Local 1107's motion for attorney fees in Docket No. 81166.

_____, J.
Cadish

We concur:

_____, C.J.
Hardesty

_____, J.
Stiglich

_____, J.
Pickering

HERNDON, J., with whom PARRAGUIRRE and SILVER, JJ., agree, concurring in part and dissenting in part:

I concur with the decision to affirm the denial of the motions for attorney fees in Docket No. 81166. I disagree, however, with the majority's decision that the district court erred in granting summary judgment on the ground that the LMRDA preempted Clarke's action in Docket No. 80520.[1]

The majority takes a very narrow view of what poses an obstacle to the accomplishment of Congress's objective in enacting the LMRDA. The Local 1107 Executive Board voted to have SEIU impose a trusteeship over the chapter after an independent hearing master concluded that there was a pattern of "a President willing, and even inclined, to sideline her fellow officers so that she can function autocratically or, at best, with a small cadre of staff whose hiring was never even approved by the [Local 1107 Executive] Board." SEIU imposed the trusteeship in an effort to return the Local 1107 to a position where the democratic process would sufficiently protect and progress the union members' needs and rights. In achieving this purpose, SEIU's 2016 constitution and bylaws authorized a trustee to remove employees and appoint new employees.

There was no question that the small cadre of staff hired by the Local 1107 president was loyal to the president and not interested in progressing the purpose and objectives of the union. These employees, including appellant Robert Clarke, exchanged numerous text messages critical of the trusteeship, referring to the trustees as "slimy nimrods" and

---

[1]Because I conclude the LMRDA preempted Clarke's claims against the SEIU, it is unnecessary to consider whether Clarke could maintain an alter ego theory of liability against the SEIU.

"twiddle dee and twiddle dumb." They also issued a press release stating the imposition of the trusteeship was illegal, "repugnant and holy [sic] unjustified." It would be infeasible for a trustee, or even a newly elected president, to work with these employees to restore democracy to the union. To limit a newly elected union official's, or in this case an appointed trustee's, ability to replace existing staff with those whose ideologies and goals aligned with the official's, and thus with the voting union members' ideologies and goals, would only hamper the democratic process of the union. The clear and manifest purpose of the LMRDA is to protect and guarantee the democratic processes of unions. Thus, it is difficult to see how the LMRDA would not preempt a wrongful termination action in these circumstances.

I am not alone in concluding that in such instances, the LMRDA preempts state wrongful termination actions. In fact, the majority does not cite to any decision supporting its conclusion because it is contrary to every published decision considering this issue. *See Screen Extras Guild, Inc. v. Superior Court*, 800 P.2d 873, 880 (Cal. 1990); *Packowski v. United Food & Commercial Workers Local 951*, 796 N.W.2d 94, 104 (Mich. Ct. App. 2010) (recognizing that "the cases finding preemption under similar circumstances are more numerous, more factually analogous, and more persuasive than the cases finding no preemption by the LMRDA of similar wrongful-discharge claims"); *Vitullo v. Int'l Bhd. of Elec. Workers, Local 206*, 75 P.3d 1250, 1255 (Mont. 2003) (providing that "a state law which interferes with the longstanding practice of union patronage, established in the union's democratically enacted constitution, is not only contrary to the overall purpose and objective of the LMRDA . . . , but is in direct conflict

SUPREME COURT
OF
NEVADA

(O) 1947A

2

with the democratic process that Congress sought to protect"); *Dzwonar v. McDevitt*, 791 A.2d 1020, 1024-26 (N.J. Super. Ct. App. Div. 2002).[2]

The preeminent case on the matter comes from California and was relied on by the district court here. In *Screen Extras Guild, Inc. v. Superior Court*, Barbara Smith was terminated from her management job with the Screen Actors Guild, and she sued the labor union and the chief administrative officer of the union for wrongful discharge. 800 P.2d at 875. Relying on *Finnegan v. Leu*, 456 U.S. 431 (1982), the California Supreme Court concluded that "the strong federal policy favoring union democracy, embodied in the LMRDA, preempts state causes of action for wrongful discharge or related torts when brought against a union-employer by its former management or policymaking employee." *Screen Extras Guild*, 800 P.2d at 874. The court determined that Congress intended "elected union officials [to] be free to discharge management or policymaking personnel" because "policymaking and confidential staff are in a position to thwart the implementation of policies and programs advanced by elected union officials." *Id.* at 880. Thus, "[t]o allow a state claim for wrongful discharge

---

[2]In addition to these cases, a few jurisdictions have implicitly concluded that the LMRDA preempted the state law claim but based their holdings on a determination that the employee did not qualify as a policymaking or confidential employee. *Shuck v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 837*, 2017 WL 908188 (E.D. Mo., Mar. 7, 2017) (refusing to adopt California's broad protection for all wrongful termination actions against unions and concluding that the subject employee was not a confidential employee because she was an administrative assistant); *Lyons v. Teamsters Local Union No. 961*, 903 P.2d 1214, 1220 (Colo. Ct. App. 1995); *Young v. Int'l Bhd. of Locomotive Eng'rs*, 683 N.E.2d 420 (Ohio Ct. App. 1996) (concluding the employee was not a policymaking or confidential employee, but appearing to recognize that if the employee was, the cause of action would be preempted by the LMRDA).

to proceed from the termination of a union business agent by elected union officials would interfere with the ability of such officials to implement the will of the union members they represent" and "would frustrate full realization of the goal of union democracy embodied by the LMRDA." *Id.* at 881. In the 30 years since *Screen Extras Guild* was decided, no court, in a published opinion, has reached an opposite conclusion.

While I recognize *Finnegan* did not address the underlying type of case, I disagree with the majority's portrayal of the U.S. Supreme Court's analysis of the LMRDA. The U.S. Supreme Court's language strongly indicates that the LMRDA's purpose of ensuring union democracy requires that an elected union official be able to freely choose his or her staff. 456 U.S. at 441-42 (concluding that "Congress simply was not concerned with perpetuating appointed union employees in office at the expense of an elected president's freedom to choose his own staff"). The court recognized that "the ability of an elected union president to select his own administrators is an integral part of ensuring a union administration's responsiveness to the mandate of the union election," *id.* at 441, which ensures the democracy of unions and is the clear and manifest purpose of the LMRDA.

In a democracy, it would be difficult, if not impossible, for an elected official to meet the goals on which the official ran for election if saddled with a prior official's staff. The majority's conclusion to the contrary creates a clear obstacle to the accomplishment of Congress's objective in enacting the LMRDA to protect the democratic processes of unions. Nothing could be more evident of this than requiring a trustee, appointed to return a local chapter to an effective democracy, to continue the employment of a union employee involved in obstructing the local chapter's

democracy merely because the previous president entered into a for-cause employment contract with the employee.

Therefore, I conclude the district court did not err in granting the union's motion for summary judgment because the LMRDA preempts Clarke's action. Accordingly, I dissent because I would affirm the district court's decision in Docket No. 80520.

_____, J.
Herndon

We concur:

_____, J.
Parraguirre

_____, J.
Silver